IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ESSINGTON AVENUE PARTNERS II, LLC trading as ESSINGTON AVENUE PARTNERS, II, L.P.<br><br>and<br><br>MERION CONSTRUCTION MANAGEMENT, LLC,<br><br>                       Plaintiffs,<br><br>       vs.<br><br>ARGONAUT INSURANCE COMPANY,<br>                       Defendant | Civil Action No.: 11-5324-JS |
| ARGONAUT INSURANCE COMPANY,<br>             Third-Party Plaintiff,<br><br>       vs.<br><br>O'NEILL PROPERTIES GROUP, L.P., REFRIGERATION SERVICE ASSOCIATES, INC.,<br>WARWICK REALTY, LLC, PATRICK CHAMBERS and BRENDA CHAMBERS<br>             Third-Party Defendants | |

## AMENDED COMPLAINT

      Plaintiffs, Essington Avenue Partners II, LLC trading as Essington Avenue

Partners II, L.P. and Merion Construction Management, LLC, by and through their undersigned

attorneys, file this Amended Complaint against Defendant, Argonaut Insurance Company, and in

support thereof aver the following:

## PARTIES

1.        Plaintiff, Essington Avenue Partners II, LLC trading as Essington Avenue Partners II, L.P. ("EAP II") is a limited partnership organized and existing under the laws of the State of Delaware, with its principal place of business at 2701 Renaissance Blvd., Fourth Floor, King of Prussia, Pennsylvania, 19406.  EAP II's general partner is Essington Avenue Partners II, LLC, a limited liability company organized and existing under the laws of the state of Delaware. Essington Avenue Partners II, LLC has one sole member, J. Brian O'Neill, who resides in the Commonwealth of Pennsylvania.  J. Brian O'Neill is also the sole limited partner in EAP II.  At all times material hereto, EAP II was the contractor responsible for providing certain design services and construction related activities in connection with the construction of the new Philadelphia Regional Produce Center (the "Project").

2.        Plaintiff, Merion Construction Management, LLC ("Merion"), is a limited liability company organized and existing under the laws of the Commonwealth of Pennsylvania, with its principal place of business at 2701 Renaissance Blvd., Fourth Floor, King of Prussia, Pennsylvania, 19406.  Merion has two members: J. Brian O'Neill and Miriam O'Neill.  J. Brian O'Neill and Miriam O'Neill reside in the Commonwealth of Pennsylvania.  At all times material hereto, Merion was a subcontractor responsible for furnishing construction services at the Project.  Merion entered into two sub-subcontracts with Refrigeration Service Associates, Inc. ("RSA") to carry out certain construction services at the Project.

3.        Defendant, Argonaut Insurance Company ("Argo"), is a corporation organized and existing under the laws of the State of Illinois, with its principal place of business in the County of Cook, Illinois.  Argo is an insurance and surety company.  In connection with

one of RSA's sub-subcontracts, Argo, as surety, provided a Payment and Performance Bond on behalf of RSA, as principal, naming EAP II, Merion and others as co-obligees.

## JURISDICTION

4.      This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332 because EAP II and Merion on one hand, and Argo on the other hand, are citizens of different states and because the amount in controversy exceeds the sum of $75,000 exclusive of interest and costs.

5.      Under 28 U.S.C. § 1391, venue is proper in this judicial district because a substantial part of the events giving rise to this cause of action occurred in this judicial district.

## FACTUAL BACKGROUND

6.      The Philadelphia Regional Port Authority (the "PRPA") is the owner of real property situated at 6700 Essington Avenue, Philadelphia, Pennsylvania (the "Property").

7.      On September 16, 2008, the PRPA entered into a contract (the "Design-Build Contract" or the "Prime Contract") with EAP II to provide certain design services and construction related activities at the Property in connection with the construction of the Project.

8.      Also on September 16, 2008, EAP II entered into a subcontract with Merion to provide all construction and construction related work for the Project (the "Merion Subcontract").

9.      Merion entered into two sub-subcontracts with RSA, effective as of July 27, 2009, to perform certain construction work in connection with the Project.

10.     Under the first sub-subcontract ("Subcontract No. 1"), RSA was obligated to provide labor and overall coordination of its work at the Project.  Subcontract No. 1 includes all work necessary to furnish and install the refrigeration system at the Project except for certain electrical work and insulation work and furnishing equipment for the refrigeration system at the Project (the "Subcontract No. 1 Work").  A true and correct copy of Subcontract No. 1, including Exhibit A to Subcontract No. 1, is attached hereto as **Exhibit A**.  The remaining exhibits attached to Subcontract No. 1 have been intentionally excluded because these exhibits are voluminous and Subcontract No. 1 is already in the possession of all of the parties.

11.     Under the second sub-subcontract ("Subcontract No. 2"), RSA was obligated to perform certain electrical work and insulation work and to furnish equipment for the refrigeration system at the Project.

12.     In connection with Subcontract No. 1, Argo, as surety, provided Payment and Performance Bond No. SUR0001982 (the "Bond") on behalf of RSA, as principal, to EAP II, Merion and others, as co-obligees.  A true and correct copy of the Bond is attached hereto as **Exhibit B**.

13.     According to the terms of the Bond, Argo is jointly and severally liable with RSA to "defend, indemnify and save harmless [Merion and EAP II] … from and against any expense incurred through the failure of [RSA] to complete the Subcontract Work as specified and for any and all claims, demands, suits or damages growing out of the manner of performance of the Subcontract No. 1 by [RSA] or its Subcontractors."

14.     The Bond provides that Argo's obligations under the Bond "arise when a Co-Obligee has notified the Contractor and the Surety in writing that Contractor is in default under the Subcontract No. 1."

15.     The Bond incorporates the terms of Subcontract No. 1 by reference.

16.     Article 6.1 of Subcontract No. 1 provides that RSA "shall work in strict accordance with any schedule provided by [Merion], including any updated or modified schedules."

17.     Article 6.1 further provides that RSA "shall achieve substantial completion of the entire Subcontract Work no later that the date provided by the Contractor in any such schedules for the completion of the Subcontract Work, as that date may be extended in accordance with the Prime Contract."

18.     Article 10.2 of Subcontract No. 1 provides that RSA "shall be liable to [Merion] for all costs, including attorneys' fees, that [Merion] incurs as a result of [RSA's] failure to perform its work in strict compliance with the Contract Documents … Such costs shall include, but not be limited to, … [Merion's] increased costs to perform its contract with EAP II as a result of delays or improper work caused by RSA … or litigation costs and attorneys' fees arising from actions to enforce this Subcontract, to recover for its breach, or to deal with third-party claims arising from the Subcontractor's breach of this Subcontract."

19.     Subcontract No. 1 requires RSA to complete the Subcontract No. 1 Work at such time as to allow start-up/commissioning of the entire refrigeration system to begin at least ninety (90) days prior to the date of final completion of the Project (the "Start

Commissioning Date") and to end within sixty (60) days of final completion (the "Finish Commissioning Date").

20.     Exhibit A of Subcontract No. 1 establishes the Start Commissioning Date as May 1, 2010.

21.     Exhibit A of Subcontract No. 1 establishes the Finish Commissioning Date as May 31, 2010.

22.     Exhibit A of Subcontract No. 1 establishes the date of final completion (the "Finish Date") as July 30, 2010.

23.     During its performance of the Subcontract No. 1 Work, RSA repeatedly breached Subcontract No. 1 by failing to complete the Subcontract No. 1 Work in accordance with the schedules established by Merion and failing to supply a sufficient number of properly skilled supervisors and workmen to properly and expeditiously carry out the Subcontract No. 1 Work.

24.     On January 14, 2010, RSA met with Merion in Merion's office.  During that meeting, RSA provided its schedule dated 1/14/10.

25.     RSA continuously issued schedule updates reflecting completion of the Subcontract No. 1 Work in accordance with the overall schedule, but RSA's schedule updates did not reflect its actual progress.

26.     On March 25, 2010, Merion advised RSA of its concerns regarding RSA's performance under Subcontract No. 1 including, but not limited to, RSA's supervision, manpower and schedule issues.

27.     RSA's performance did not improve.

28.     On May 23, 2010, Merion sent to RSA a "Notice of Breach and Request for Recovery Schedule."

29.     In response, RSA submitted a recovery schedule dated May 24, 2010.

30.     Merion rejected RSA's proposed recovery schedule because the plan was flawed and the logic, sequences and durations were unrealistic and unachievable.

31.     After Merion rejected the proposed recovery schedule, RSA's performance as compared to the schedule continued to slip.

32.     During a June 30, 2010 meeting, Mark DeWitt, RSA's Project Manager, stated that at its then-current labor force, RSA would likely complete its work in October 2010.

33.     Merion rejected the proposed schedule as their was no basis under the Prime Contract or Subcontract No. 1 for extending RSA's completion date.

34.     Merion requested another recovery plan from RSA.

35.     On July 9, 2010, RSA submitted a proposed schedule indicating a completion date of November 26, 2010.

36.     Merion again rejected the proposed schedule.

37.     In or about July 2010, despite the fact that RSA was significantly behind schedule, RSA cut the number of workers it employed at the Project.

38.     On July 22, 2010, Merion notified RSA that it was in default under Subcontract No. 1 and Subcontract No. 2 (the "Default Notice").

39.     In the Default Notice, Merion demanded that RSA take all necessary steps to overcome the actual and predicted delays at the Project.

40.     Argo received a copy of the Default Notice.

41.     The Default Notice triggered Argo's obligations under the Bond.

42.     In response to the Default Notice, Argo provided supervision at the Project site and financial support to RSA under Subcontract No. 1.

43.     Argo provided supervision and financial support to RSA under Subcontract No. 1 without a reservation of rights.

44.     Argo placed three employees and/or representatives onsite in a supervisory capacity.

        a.     Bill Bloodgood served a dual role as Argo's project manager and foreman.  He was onsite at the Project full-time, and he directed RSA's manpower in the field.

        b.     Lou Baldasarre monitored RSA's operations from the RSA onsite job trailer.  He was onsite 3-4 days each week

        c.     James Rudnick also monitored RSA's progress at the Project.  He was onsite from time to time.

45.     At the request of Argo and based on written consent of surety provided by Argo, Merion continued to pay contract balances to RSA.

46.     In September 2010, RSA submitted Application for Payment No. 12, covering work performed by RSA through September 2010 under Subcontract No. 1 ("Application No. 12").

47.     Merion reviewed Application No. 12 and informed RSA and Argo that pursuant to the terms of Subcontract No. 1, Application No. 12 was subject to a $252,052 deduction to account for a workers' compensation adjustment, also know as a Contractor Controlled Insurance Program credit ("CCIP credit").

48.     On October 1, 2010, Argo wrote to Merion, informing Merion that if it did not pay Application No. 12 in full, Argo would withdraw its support of RSA under Subcontract No. 1.

49.     In order to avoid further Project delays, Merion paid Application No. 12 in full, reserving its right to seek reimbursement for the CCIP credit at a later time.

50.     RSA failed to timely complete the Subcontract No. 1 Work as required by Subcontract No. 1.

51.     In fact, RSA did not complete the Subcontract No. 1 Work until January 28, 2011.

52.     As a result of RSA's and Argo's failure to timely complete the Subcontract No. 1 Work in accordance with the Project schedule, Merion and EAP II incurred substantial costs and expenses including, but not limited to, the following:

         a.     Additional interest and financing charges paid to Project lenders;

         b.     Additional utility expenses;

         c.     Additional site maintenance expenses;

         d.     Additional rental expenses;

         e.     Additional field office expenses;

         f.     Additional general conditions expenses;

         g.     Additional personnel expenses; and

         h.     Legal fees.

53.     Moreover, RSA and Argo failed to complete certain items of Subcontract No. 1 Work in accordance with the Subcontract No. 1.

54.     Merion and EAP II incurred substantial expenses and costs in connection with correcting RSA's defective Subcontract No. 1 Work.  These costs and expenses include, but are not limited to, the following:

         a.     Racking storage and remobilization charges;

         b.     Costs associated with expediting the insulation schedule;

         c.     Costs associated with repairing and/or replacing damage to the work of other subcontractors;

     d.          Costs associated with repairing insulation at the condensate drains to comply with applicable codes and regulations;

     e.          Costs associated with repairing CEV grating;

     f.          Costs associated with replacing the roof as a result of weld slag damage;

     g.          Costs associated with the installation of sway bracing;

     h.          Costs associated with cutting openings in CMU walls for pipe "windows;" and

     i.          Legal fees.

55.     EAP II has asserted claims against Merion to recover these additional costs and expenses.

56.     On August 18, 2011, Merion and EAP II entered into a liquidating agreement, whereby Merion admitted liability to EAP II for the delays caused by RSA and RSA's defective work to the extent that Merion is able to recover damages from RSA, the party ultimately responsible.

57.     Pursuant to Article 10.2 of Subcontract No. 1, RSA is liable to Merion for all costs, including attorneys' fees, incurred by Merion as a result of RSA's failure to complete its work in accordance with Subcontract No. 1.

58.     According to the terms of the Bond, Argo is jointly and severally liable with RSA to Merion for these same costs and expenses.

59.     Merion and EAP II have demanded payment from RSA and Argo.

60.     RSA has refused to reimburse EAP II for the costs and expenses incurred as a result of delays caused by RSA.

61.     RSA has refused to reimburse Merion for the costs and expenses incurred as a result of RSA's failure to complete its work in accordance with Subcontract No. 1.

62.     From July 2010 until recently, Argo has been investigating EAP II's and Merion's claims in order to confirm that payment is due and owing to Merion and EAP II.

63.     Merion and EAP II fully cooperated with Argo during its investigation and provided all of the Project records that Argo requested.

64.     On August 2, 2011, representatives from EAP II, Merion and Argo met at Merion's offices.

65.     After the meeting, Argo refused to reimburse Merion and EAPII for the expenses that they incurred as a result of RSA's delays and RSA's failure to complete the Subcontract No. 1 Work in accordance with Subcontract No. 1.

66.     Argo's refusal constitutes a breach of its obligations to Merion and EAP II under the Bond.

## COUNT I
## Merion and EAP II Against Argo
## Breach of the Bond

67.     Merion and EAP II incorporate the foregoing paragraphs of this Complaint as if set forth herein at length.

68.     On September 16, 2008, the PRPA and EAP II entered in the Design-Build Contract.

69.     On September 16, 2008, EAP II and Merion entered into the Merion Subcontract.

70.     Merion subsequently entered into Subcontract No. 1 with RSA.

71.     In connection with Subcontract No. 1, RSA procured the Bond issued by Argo, as surety, on behalf of RSA, as principal, to EAP II, Merion and others, as a co-obligees.

72.     RSA breached Subcontract No. 1 by failing to perform in accordance with the terms of the Subcontract.

73.     As a result of RSA's breach, Merion and EAP II incurred additional costs and expenses.

74.     On August 18, 2011, Merion and EAP II entered into a liquidating agreement, whereby Merion agreed to pursue EAP II's claims against RSA and admitted liability to EAP II to the extent that Merion recovers from RSA.

75.     Despite Merion's and EAP II's demands, Argo refuses to honor its obligations under the Bond.

76.     All of the conditions precedent to the right of Merion and EAP II to recover under the Bond have been satisfied or waived.

77.     Merion and EAP II performed all of their obligations under the Bond.

78.     By reason of RSA's failure to perform in accordance with the terms of Subcontract No. 1, Argo, as surety, and RSA, as principal, under the terms of the Bond, are jointly and severally liable for damages in excess of $75,000.

WHEREFORE, Plaintiffs, EAP II and Merion, demand judgment against Defendant, Argo, in excess of the $75,000, prejudgment and post-judgment interest, and such further relief as the Court may deem appropriate together with interest, costs and attorneys' fees.

Respectfully Submitted,

Raymond L. DeLuca
Attorney I.D. No. 78154
James D. Hollyday
Attorney I.D. No. 47393
James M. Kwartnik, Jr.
Attorney I.D. No. 307655
PEPPER HAMILTON LLP
3000 Two Logan Square
Eighteenth and Arch Streets
Philadelphia, PA 19103-2799
(215) 981-4000

Attorneys for Plaintiffs,
*Essington Avenue Partners, II, LLC trading as*
*Essington Avenue Partners II, L.P. and*
*Merion Construction Management, LLC*

## CERTIFICATE OF SERVICE

I, Raymond L. DeLuca, hereby certify that on November 14, 2011 a true and correct copy of the foregoing Amended Complaint was served via United States First Class Mail upon the following:

> Matthew A. Lippman, Esquire
> McElroy, Deutsche, Mulvanney & Carpenter, LLP
> 1617 John F. Kennedy Blvd., Suite 1500
> Philadelphia, PA 19103
>
> Warwick Realty, LLC
> 214 Camars Drive
> Warminster, PA 18974
>
> Patrick Chambers
> 1210 Woodbrook Lane
> Warminster, PA 18974
>
> Brenda Chambers
> 1210 Woodbrook Lane
> Warminster, PA 18974

Raymond L. DeLuca, Esquire